# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYRA IZZARD,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COUNTY OF MONTGOMERY,** | : | |
| **PENNSYLVANIA,** *et al.,* | : | **No. 21-418** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                        NOVEMBER 29th, 2021

### INTRODUCTION

Tyra Izzard alleges that she experienced discrimination while working at the Montgomery County Correctional Facility. Ms. Izzard is a black female and is openly gay. She invokes § 1983 and claims that she experienced discrimination on the basis of her race, gender, and sexual orientation in violation of the Fourteenth Amendment's Equal Protection Clause. In addition, she claims that the discrimination on the basis of her gender and sexual orientation rose to the level of a hostile work environment, also in violation of the Equal Protection clause. Lastly, she claims that her termination from the Montgomery County Correctional Facility violated the Fourteenth Amendment's Due Process Clause. The defendants moved to dismiss Ms. Izzard's complaint in its entirety. The defendants have only met their burden in part, and, hence, the Court partially grants their Motion to Dismiss.

### BACKGROUND

Ms. Izzard's claims arise from her time working at the Montgomery County Correctional Facility. Ms. Izzard was a Correctional Officer and later promoted to corporal. Doc. No. 1, Compl.

1

¶¶ 16, 18. Ms. Izzard worked under Assistant Warden Martha D'Orazio and Warden Julio Algarin, both of whom Ms. Izzard alleges are "policymakers" for purposes of § 1983. *Id.* ¶¶ 5–6. She alleges four counts against Montgomery County and against Ms. D'Orazio and Mr. Algarin both in their individual and official capacities. Count I alleges discrimination on the basis of race, Count II alleges discrimination of the basis of gender and sexual orientation, Count III alleges hostile work environment on the basis of gender and sexual orientation, and Count IV alleges a Due Process Clause violation regarding the termination of Ms. Izzard's employment.

All of Ms. Izzard's various allegations originate with the same catalyst: the fact that she did not receive a promotion. Ms. Izzard alleges that she was not promoted from corporal to lieutenant when the position opened in "late 2018," but that two male corporals were, and that she was never given a reason why the defendants refused to promote her. *Id.* ¶¶ 18–24. Ms. Izzard allegedly began inquiring into this decision and her work performance during a meeting with Assistant Warden D'Orazio. *Id.* ¶¶ 25–27. During this meeting with Ms. D'Orazio, Ms. Izzard also allegedly expressed her concern that her performance was not being evaluated fairly. *Id.* ¶ 27. In addition, Ms. Izzard allegedly informed Assistant Warden D'Orazio of the sexual harassment that she experienced on a regular basis, the generally inappropriate workplace behavior of her coworkers, and the racial discrimination she suffered at the hands of her coworkers. *Id.* ¶¶ 28–33, 43. Allegedly Ms. D'Orazio responded by saying "you know how guys are" and did not take any action. *Id.* ¶ 34. Ms. Izzard then raised these same concerns with Warden Algarin, who allegedly agreed that the evaluations had been unfair. *Id.* ¶ 37. Ms. Izzard also alleges that Mr. Algarin refused to transfer her to the day shift in order to avoid the harassment from her colleagues, but that Mr. Algarin did transfer a straight female officer. *Id.* ¶¶ 38–39.

2

Second, as a result of her meetings with her superiors, Ms. Izzard alleges she then experienced retaliation in the form of additional workplace discrimination by her direct supervisors and colleagues. *Id.* ¶¶ 41–42. She notes that her white colleagues often used the slang term "DAN," which she says was understood by all to mean "Dumb Ass N****r" and that her direct superiors also knew this. *Id.* ¶¶ 42–43. In addition, Ms. Izzard alleges that she was disciplined by Captain Moyer for briefly stepping away from her assigned post in order to go to the staff dining hall, an action that she alleges officers often did and had never been disciplined for doing in the past. *Id.* ¶¶ 44–50. For this alleged violation in December 2018, Ms. Izzard claims she was suspended by Captain Moyer, and that Captain Moyer failed to provide her with written notice, the suspension's duration, and other required information. *Id.* ¶¶ 50–51. She claims that her white colleagues were not disciplined for similar actions or did not receive as harsh of discipline as she did. *Id.* ¶¶ 52–54. Moreover, she alleges that almost all officers in charge of discipline at the facility are white. *Id.* ¶ 53.

Third, as part and parcel of the retaliation claim, Ms. Izzard alleges that the staff at the facility filed additional reports about her behavior while she was suspended, including an alleged write-up about an inappropriate relationship with a female inmate in January 2019. *Id.* ¶¶ 56, 63–64. Ms. Izzard claims that nobody at the facility informed her of the precise nature of the claims against her, but that she was instead issued a second disciplinary violation for meeting with an inmate and not properly documenting the meeting. *Id.* ¶¶ 56–58. Ms. Izzard claims it was common practice among correctional staff to hold meetings like this and that other white and straight officers were not disciplined for this same behavior. *Id.* ¶¶ 60–62. In addition, Ms. Izzard claims that correctional staff at the facility created a rumor that she had an inappropriate relationship with

3

an inmate at the facility and had a "wedding" with this inmate, but that the rumor was concocted in order to create additional pretext to terminate her employment. *Id.* ¶¶ 63–69.

Fourth and finally, Ms. Izzard alleges that she was terminated without ever receiving any written notice or reason. *Id.* ¶¶ 70–71. This forms her Due Process claim in Count IV.

As to all these claims, Ms. Izzard claims that the defendants failed to address the discriminatory or retaliatory conduct. *Id.* ¶ 79. In addition, she claims that the defendants failed to take corrective or remedial measures to make the workplace free of discrimination and retaliation. *Id.* Ms. Izzard alleges that Ms. D'Orazio's, and Mr. Algarin's actions, or lack thereof, rose to the level of deliberate indifference to her protected constitutional rights. *Id.* ¶ 81.

The defendants moved to dismiss Ms. Izzard's complaint in its entirety. Doc. No. 6. Ms. Izzard filed her response in opposition. Doc. No. 8. The Court held an oral argument on the defendants' motion to dismiss.

For the reasons that follow, the Court grants the defendants' Motion as to the claims against Montgomery County in Counts I and II. The Court also grants the defendants' Motion to Dismiss all allegations against Ms. D'Orazio and Mr. Algarin in their *official* capacities. The Court, however, denies the defendants' Motion to Dismiss the claims against Ms. D'Orazio and Mr. Algarin in their *individual* capacities in Counts I and II and the claims against *both* Montgomery County and Ms. D'Orazio and Mr. Algarin in their *individual* capacities in Counts III and IV.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007). The question is not whether the claimant "will ultimately prevail. . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court may consider "only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, the Court must accept as true all reasonable inferences emanating from the allegations and view those facts and inferences in the light most favorable to the nonmoving party. *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions").

DISCUSSION

The defendants pose three chief legal arguments: (1) Ms. Izzard's claims were wrongly brought under § 1983, (2) Ms. Izzard's complaints are time-barred, and (3) Ms. Izzard failed to plausibly allege any claim as is required under FRCP 12(b)(6). The Court addresses each of the defendants' arguments in turn.

## I.   Ms. Izzard May Bring These Claims Under § 1983

The first issue in this case is whether Ms. Izzard can bring her claims under § 1983. The defendants claim that Ms. Izzard should have brought her claims under Title VII, but improperly

brought her claims under § 1983. Doc. No. 6-2, at 4–5. Ms. Izzard claims the defendants' argument on this point is patently wrong. Doc. No. 8, at 4–5. Ms. Izzard is correct.

The defendants' argument is based on *Williams v. Pa. Human Relations Comm'n*, 870 F.3d 294 (3d Cir. 2017). The *Williams* Court analyzed Congress' purpose in enacting Title VII and the ADA and noted that the comprehensive remedial scheme of those statutes made them incompatible with the individual enforcement mechanism of § 1983. *Id.* at 297–99. With that in mind, the Third Circuit Court of Appeals held that the plaintiff in *Williams* could not bring "pure" Title VII and ADA statutory claims through § 1983. *Id.* at 299–300.

Ms. Izzard, on the other hand, points to the limiting language the Third Circuit included in its footnote. The *Williams* Court did specifically limit its holding, stating "we need not address whether a plaintiff may allege independent *constitutional* violations under § 1983 based on the same underlying facts. At least in the Title VII context, however, there is a strong argument that plaintiffs may advance an employment discrimination claim under § 1983 based on an Equal Protection Clause violation, either concurrently with, or independent of, a Title VII violation." *Id.* at 300 n.34 (emphasis in original). The Court's statement expressly limiting its own holding is sufficient to find in favor of Ms. Izzard on this issue.

Moreover, subsequent district court decisions confirm this reading is correct. In *Shklyar v. City of Pittsburgh*, No. 18-cv-1588, 2019 WL 6118716 (W.D. Pa. Nov. 18, 2019), the court directly addressed almost identical claims to those at issue here. The plaintiff in that case sued on a theory of employment discrimination under § 1983 for national origin discrimination in violation of the Equal Protection Clause. *Id.* at *2. The city moved to dismiss the plaintiff's claim on the basis that the plaintiff's Title VII claims were duplicative of her § 1983 claim. *Id.* at *8. The court discussed the Court of Appeals' holding in *Williams* and concluded that "*Williams* applies only

when a plaintiff is attempting to use § 1983 to vindicate statutory rights, not when a plaintiff seeks redress for constitutional violations such as those afforded by the Equal Protection Clause." *Id.* Moreover, the court went on to discuss that just because "the rights at issue under Title VII and the Equal Protection Clause appear to overlap" does not mean that the § 1983 claim is "impermissibly duplicative of [the] Title VII claim." *Id.* Another court in this Circuit reached the same conclusion recently in *Bates v. Montgomery Cnty.*, No. 20-cv-2956, 2021 WL 4243432, at *5 (E.D. Pa. Sept. 17, 2021) ("Defendants' arguments fail because *Williams* applies when a plaintiff attempts to use § 1983 to assert statutory rights, not when a plaintiff seeks redress for constitutional violations such as those afforded by the Equal Protection Clause."). *Bates* addressed claims of discrimination against the same facility and Mr. Algarin, and rejected this very same argument by some of the same defendants. *Id.*

As further support for this conclusion, in *Bullock v. City of Phila.*, No. 19-cv-1183, 2020 WL 4365601 (E.D. Pa. July 30, 2020), the court held that the plaintiff's § 1981 claim for racial discrimination against the city of Philadelphia, brought under § 1983, could proceed even though it could also be brought under Title VII. *Id.* at *6. The court stated: "Because the Defendant is a state actor, [d]iscrimination claims [against it] may be brought under either [Title VII or § 1983] or both." *Id.* at *6 (alterations in original) (internal quotation omitted).

Therefore, the Court rejects the defendants' Motion to Dismiss on this basis.

## II.   Ms. Izzard's Claims Are Not Time-Barred Under § 1983's Two-Year Statute of Limitations

Next, the defendants argue that because Ms. Izzard filed her complaint on January 29, 2021, the Court may not consider any allegation prior to January 29, 2019. Doc. No. 6-2, at 5. Ms.

Izzard responds that this is incorrect under the "continuing-violation doctrine." Doc. No. 8, at 6. At least at this stage of the litigation, Ms. Izzard will not be foreclosed on this basis.

"The statute of limitations for a § 1983 claim arising in Pennsylvania is two years." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). This is based on the underlying Pennsylvania state tort law statute of limitations. *See* 42 Pa. Cons. Stat. § 5524(2); *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The continuing-violation doctrine invoked by Ms. Izzard is an "equitable exception to the timely filing requirement." *Cowell v. Palmer Twp.* 263 F.3d 286, 292 (3d Cir. 2001). Under this equitable exception, a plaintiff's action is timely "so long as the last act evidencing the continuing practice falls within the limitations period." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). This doctrine has been construed narrowly and often applied, like here, in cases of employment discrimination because a plaintiff employee may only realize in retrospect that "seemingly unconnected incidents were, in fact, part and parcel of a larger discriminatory pattern." *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014). In order to fall within this narrow doctrine, therefore, the alleged violation must be "occasioned by continual unlawful acts" not simply "ill effects" from an earlier violation. *Id.* If an allegation falls within the "continuing violation doctrine," "so long as the most recent offensive utterance or adverse action occurred within the limitations period, the entire scope of that continuing violation may be considered." *Id.*

Here, the timing dispute centers on two allegations from 2018. First, Ms. Izzard's claim that she was not promoted allegedly took place "during late 2018." Doc. No. 1, Compl. ¶ 19. Second, Ms. Izzard's claim relating to the discriminatory disciplinary violation for leaving her post to go to the employee dining hall allegedly took place on December 23, 2018. *Id.* ¶¶ 44–54. Because the cutoff date for the two-year period prior to Ms. Izzard's complaint was January 29,

2019, the defendants claim that these allegations, which are premised on events predating January 29, 2019, are barred by the statute of limitations. Doc. No. 6-2, at 5–6.

There is a non-frivolous argument that Ms. Izzard's claim that she was passed over for a promotion is not related to the later allegations of discrimination, retaliation, and termination. However, the better understanding at this stage of the litigation is that the lack of promotion is the catalyst that set the subsequent events in motion. Ms. Izzard first raised the issue of the promotion in her next meeting with Ms. D'Orazio. Doc. No. 1, Compl. ¶¶ 25–34. It was in this same meeting that Ms. Izzard raised many of her other complaints about the way coworkers treated her, the sexual harassment, the unfair evaluations, and the racially insensitive remarks. *Id.* When Ms. D'Orazio did not act on any of Ms. Izzard's complaints, Ms. Izzard then allegedly raised them with Mr. Algarin. *Id.* ¶ 35. It was after this meeting that Ms. Izzard began allegedly experiencing the retaliatory discrimination by her direct supervisors and colleagues. *See id.* ¶¶ 44, *et seq.* Thus, it is more plausible that Ms. Izzard's complaint about being passed over for a promotion in late 2018 was the spark. If it is true that the management at the facility did not act on Ms. Izzard's complaints when they should have and that employees retaliated against her after these meetings, culminating in her termination on February 11, 2019, this would constitute "continual unlawful acts" and not just "ill effects." *Tearpock-Martini*, 756 F.3d at 236. At this stage, in an employment case like this, it is plausible that Ms. Izzard only realized in retrospect that "seemingly unconnected incidents were, in fact, part and parcel of a larger discriminatory pattern." *Id.*

Because her alleged termination occurred on February 11, 2019, within the two-year statute of limitations, and because this could be part of a "continuing violation," the Court denies the defendants' Motion to Dismiss on this issue at this stage.

### III.   Ms. Izzard's Claims in Counts I and II Are Dismissed in Part

A claim for discriminatory treatment and conduct may form the basis of a claim under the Equal Protection Clause. *See, e.g.*, *Hiester v. Fischer*, 113 F. Supp. 2d 742, 746–747 (E.D. Pa. 2000) (analyzing a § 1983 claim for discriminatory conduct on the basis of sex in violation of Equal Protection Clause).

To allege a claim under the Equal Protection Clause, a plaintiff may allege a complaint as a member of a class or as a "class of one" under the theory of *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). To allege an Equal Protection claim generally, a plaintiff must allege "(1) that [s]he was treated differently from other similarly situated individuals, and (2) that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, ... or to prevent the exercise of a fundamental right." *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (internal quotation omitted) (alterations in original). To allege selective enforcement under the "class of one" theory, the Third Circuit Court of Appeals has clarified that a plaintiff must allege, at least, that "(1) the defendant treated [her] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).[1]

Ms. Izzard has raised several alleged violations of the Equal Protection Clause in Counts I and II. These include: (1) discrimination on the basis of race, (2) discrimination on the basis of gender, and (3) discrimination on the basis of sexual orientation. Within each count, Ms. Izzard has alleged them as against Montgomery County under a theory of *Monell* liability and against

---

[1] Here, at least on the face of her complaint, Ms. Izzard does not appear to allege a "class of one" argument. At oral argument on this matter, Ms. Izzard did not clarify whether her allegations are under this theory. As such, the Court will not address this theory.

Assistant Warden D'Orazio and Warden Algarin in *both* their individual and official capacities. The Court will analyze each theory of liability separately and address each alleged Equal Protection Clause violation in Counts I and II under each separate theory

### A. Ms. Izzard's Claims Against Ms. D'Orazio and Mr. Algarin in Their Official Capacities Must Be Dismissed as Duplicative

Ms. Izzard's claims against Ms. D'Orazio and Mr. Algarin must be dismissed. Ms. Izzard concedes, as she must, that she cannot litigate both the *Monell* claims against Montgomery County and the claims against Ms. D'Orazio and Mr. Algarin in their *official* capacities. *See* Doc. No. 8, at 9 n.2 ("Plaintiff does not contest that the claims against the Defendants, Warden Algarin and Assistant Warden D'Orazio . . . in their official capacities are duplicative of the claims asserted against Defendant, County of Montgomery."). Indeed, the Supreme Court clarified in *Kentucky v. Graham* that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." 473 U.S. 159, 165–166 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978)); *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (quoting same).

Therefore, the Court will grant the defendants' Motion to Dismiss as to all claims against Ms. D'Orazio and Mr. Algarin in their *official* capacities in Counts I–IV.

### B. Ms. Izzard Has Failed to Plausibly State a Claim Against Montgomery County

A county, municipality, or agency may not be sued under § 1983 unless their policy or custom caused Plaintiff's injury. *Monell*, 436 U.S. at 694. This is because only practices that are so permanent and well-settled may be attributed to the policymakers. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Under *Monell*, a plaintiff must allege (1) a constitutionally-protected right has been violated and (2) the alleged violation resulted from a municipal policy, custom, or

practice of deliberate indifference to the rights of citizens. *Id.* "Under § 1983, only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality." *Bielevicz*, 915 F.2d at 850. However, a plaintiff does *not* need to identify a responsible decisionmaker in his or her pleadings to properly allege a § 1983 claim under *Monell*. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).

At step two of the above analysis, a "policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Estate of Roman,* 914 F.3d at 798 (internal quotation omitted). However, a lack of training or education may itself constitute a policy. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989). When a plaintiff alleges a failure to train or educate, she must demonstrate that the municipality's failure to train or educate its employees amounts to deliberate indifference or "reflects a deliberate or conscious choice." *Estate of Roman*, 914 F. 3d at 798. "To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice, it must be shown that '(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 179–80 (3d Cir. 2011) (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). In addition, the identified failure to train or educate must have caused the constitutional violation. *Id.* at 180. A failure to train or educate claim generally requires a "pattern of similar constitutional violations by untrained employees" in order to "demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62–63 (2011).

Custom, on the other hand, does not require specific endorsement or authorization by law and instead can be shown when "a given course of conduct. . . is so well-settled and permanent as virtually to constitute law." *Estate of Roman,* 914 F.3d at 798 (internal quotation omitted). In alleging a custom, a plaintiff must establish that "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury." *Bielevicz,* 915 F.2d at 851. A plaintiff is not, however, required to prove that the custom had the municipality's formal approval. *Estate of Roman,* 914 F. 3d at 798. Nevertheless, a mere recitation of prior complaints against a municipality is not enough to state a claim; the plaintiff must also show how "those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." *Mariani v. City of Pittsburgh,* 624 F. Supp. 506, 511 (W.D. Pa. 1986); *see also Beck v. City of Pittsburgh,* 89 F.3d 966, 973 n.7 (3d Cir. 1996) (same).

In addition, in order to prove governmental liability under *Monell,* a plaintiff must allege that the policy or custom was the "moving force" behind the constitutional deprivation. *Kentucky,* 473 U.S. at 166. In other words, there must be "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 249–50 (3d Cir. 2007) (quoting *City of Canton,* 489 U.S. at 385).

      i.   *Race Discrimination*

In Count I of the complaint, Ms. Izzard alleges race discrimination in violation of the Fourteenth Amendment's Equal Protection Clause. The defendants argue that she has not alleged any policy, custom or practice at the facility that is the cause of the alleged constitutional violation. Doc. No. 6-2, at 8.

Ms. Izzard is a black woman and she was entitled to be treated equally to similarly situated employees within the county facility. She alleges that that she was subjected to racial discrimination by white coworkers and unequal levels of discipline between white and black employees. *See, e.g.*, Doc. No. 1, Compl. ¶¶ 42–43, 52–54.[2] Ms. Izzard has, therefore, pled that similarly situated individuals were treated differently on the basis of race. This satisfies step one of *Monell* liability by alleging that her constitutionally protected right to equal treatment was violated. *Monell*, 436 U.S. at 694–95. At step two, however, both allegations fail.

First, as to Ms. Izzard's claim that she suffered racial discrimination exercised by other coworkers, Ms. Izzard has not sufficiently pled a policy, practice, or custom. For starters, Ms. Izzard does not allege any official policy or edict of racial discrimination. *See Estate of Roman*, 914 F.3d at 798. In addition, even if construed as a failure to train or educate, Ms. Izzard's claim still fails. Ms. Izzard has possibly alleged that (1) policymakers had knowledge of the racial discrimination, Doc. No. 1, Compl. ¶ 43, that (2) there was a history of employee mishandling, *id.* ¶ 42, and (3) that employee's wrong choices were causing the deprivation of her constitutional rights, *id. See Doe*, 660 F.3d at 179–180 (reciting elements). However, Ms. Izzard has not alleged that the failure to train or educate *caused* (or even bears a relationship to) the alleged discrimination. *Doe*, 660 F.3d at 180. She has only alleged that Ms. D'Orazio was aware of the racial discrimination, not that Ms. D'Orazio failed to take steps to control it nor that there was a pattern of similar violations by untrained employees, *Connick*, 563 U.S. at 62. Moreover, "the fact

---

[2] At oral argument, Ms. Izzard also argued that her claim about unfair performance evaluations was based on her race. However, nowhere in her complaint does Ms. Izzard allege this. She only claims that her evaluations were "unfair," but does allege they were unfair on the basis of her race. Even accepting accept as true all reasonable inferences emanating from Ms. Izzard's allegations and viewing those facts and inferences in the light most favorable to the nonmoving party, as the Court is required to do, the Court cannot read allegations into Ms. Izzard's complaint that are not stated. *Revell*, 598 F.3d at 134. Therefore, the Court will not address this allegation.

that further training might have prevented constitutional injury, does not, in and of itself establish a failure to train claim." *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 630 (3d Cir. 2007) (citing *City of Canton*, 489 U.S. at 392).

As for custom, Ms. Izzard again failed to plausibly allege any custom that would state a claim for relief. Ms. Izzard claims that Ms. D'Orazio and Mr. Algarin failed to act to stop employees from making racially discriminatory comments after being alerted to possible discrimination. Doc. No. 1, Compl. ¶¶ 32–34, 42–43. Ms. Izzard may have alleged that "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [her] injury." *Bielevicz,* 915 F.2d at 851. But she has done nothing more than recite prior complaints against the municipality and has not shown how "those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." *Mariani*, 624 F. Supp. at 511. As a result, her claim also fails under the custom theory.

Second, Ms. Izzard claims that she was subject to a stricter level of scrutiny and discipline for her unauthorized trip to the dining hall than similarly situated white employees. *Id.* ¶¶ 52–54. Again, however, Ms. Izzard has not claimed that there was an official policy or edict directing employees in supervisory roles to discipline officers differently based on race. *See Estate of Roman,* 914 F.3d at 798. As for a failure to train or educate theory, Ms. Izzard's claim fails out of the gate because she has not alleged, as she must, that either Ms. D'Orazio or Mr. Algarin knew of differential treatment by Captain Moyer. *Doe*, 660 F.3d at 179–180. As for custom, Ms. Izzard again failed to plausibly allege a claim that would entitle her to relief. Ms. Izzard has not alleged that the actions at issue were actions of officials whose decisions constrain the discretion of subordinates as is required, nor has she alleged that the custom was so well-settled or established

15

as to be attributable to a policymaker. *Bielevicz*, 915 F.2d at 850. Instead, Ms. Izzard only claims that "identical behavior (briefly leaving the SOC) by similarly situated white employees received much less discipline or no discipline at all." Doc. No. 1 at ¶ 52. But this does not allege a policy or custom and is merely a threadbare conclusory allegation. *Morse*, 132 F.3d at 906.

In short, Ms. Izzard has not alleged that any employee, let alone Ms. D'Orazio or Mr. Algarin, acted according to any county policy, practice, or custom as is required under *Monell*. *See, e.g.*, *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009) (finding district court properly dismissed a plaintiff's claim of race discrimination under *Monell* when plaintiff failed to allege that city employees acted pursuant to any official policy or custom); *Oaks v. City of Phila.*, 59 F. App'x 502, 504 (3d Cir. 2003) (finding no § 1983 violation in city's policy of firing all police officers who were arrested and/or criminally charged and that plaintiff failed to allege any official with final decision-making authority authorized or acquiesced in a policy or custom in violation of § 1983).

Therefore, the Court grants the defendants' Motion to Dismiss as to Ms. Izzard's claim against Montgomery County for race discrimination in violation of the Equal Protection Clause in Count I.

### ii. *Gender Discrimination*

In Count II of the complaint, Ms. Izzard alleges gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause. The defendants argue again, though with little to no analysis, that there was no policy, practice, or custom at this facility that is the cause of the alleged constitutional violation. Doc. No. 6-2, at 8–9. Despite the defendants' anemic analysis, the Court agrees that Ms. Izzard has failed to plausibly allege any policy, practice, or custom that would entitle her to relief.

Ms. Izzard is a female and was entitled to be treated equally to similarly situated male employees within the correctional facility. Ms. Izzard alleges that she did not receive a promotion because of her gender, was subjected to sexual discrimination and harassment, and that neither Ms. D'Orazio nor Mr. Algarin intervened. *See* Doc. No. 1, Compl. ¶¶ 24, 28–30.[3] Ms. Izzard has, therefore, pled that similarly situated individuals were treated differently on the basis of gender. This satisfies step one of *Monell* liability by alleging that her constitutionally protected right to equal treatment was violated. *Monell*, 436 U.S. at 694–95. At step two, however, Ms. Izzard's allegations fail again.

Considering Ms. Izzard's allegation regarding the lack of promotion first, this allegation fails to sufficiently a claim under step two of *Monell*. First, Ms. Izzard does not allege that there was any policy or edict directing employees not to promote female officers. *See Estate of Roman*, 914 F.3d at 798. As a point of comparison, another court found a plaintiff had sufficiently pleaded that the facility had a policy, practice, or custom of not promoting similarly situated black employees on the basis of race. *See Bates*, 2021 WL 4243432, at *5. There the Court found that the defendants in that case had a "habit of promoting white captains over black ones over years" such that it constituted "a practice and policy." *Id.* Assuming this was part of the factual basis of the plaintiff's complaint in *Bates*, however, there is no such similar factual basis for Ms. Izzard's complaint. Ms. Izzard does not allege this took place over years. Instead, she only alleges that rather than promoting her, the county "promoted two male Corporals." Doc. No. 1, Compl. ¶ 23. But this does not allege any policy or practice. *See Estate of Roman*, 914 F.3d at 798. As for a

---

[3] Likewise, at oral argument, Ms. Izzard also argued that her claim about unfair performance evaluations was based on her gender. However, nowhere in her complaint does Ms. Izzard allege this. As with this same claim on the basis of race, the Court will not read allegations into the complaint that are not stated. *Revell*, 598 F.3d at 134. Therefore, as above, the Court will not address this allegation.

failure to train or educate claim, even assuming that Ms. Izzard has alleged (1) that Ms. D'Orazio or Mr. Algarin knew of this situation, (2) that the situation involved a history of employee mishandling, and (3) that the wrong choice will cause the deprivation of constitutional rights, which she has not, Ms. Izzard has again failed to allege that the failure to train or educate *caused* the constitutional deprivation. *Doe*, 660 F.3d at 180. And again, "the fact that further training might have prevented constitutional injury, does not, in and of itself establish a failure to train claim." *Kline ex rel. Arndt*, 255 F. App'x at 630. Finally, as to custom, Ms. Izzard has provided no allegation, as is required, that the differential promotions of men over women is a "course of conduct" that "is so well-settled and permanent as virtually to constitute law." *Estate of Roman*, 914 F.3d at 798 (internal quotation omitted).

Second, as to her claim regarding the alleged sexual harassment and gender discrimination she experienced from other employees and supervisors and Ms. D'Orazio's or Mr. Algarin's deliberate indifference to it, the analysis is similar to the claim for racial discrimination discussed above. Ms. Izzard has not alleged any policy or edict of gender discrimination at the facility. *Id.* On a failure to intervene theory, Ms. Izzard likely may have a stronger claim, given Ms. D'Orazio's alleged comment to Ms. Izzard that "you know how guys are." Doc. No. 1, Compl. ¶ 34. This suggests an express acknowledgement of the sexual harassment taking place in the facility. *Doe*, 660 F.3d at 179–180. But, as with the racial discrimination claim, Ms. Izzard has not alleged that the failure to train or educate *caused* the constitutional violation. *Doe*, 660 F. 3d at 180. Moreover, Ms. Izzard has not alleged that any untrained employees were the perpetrators of the alleged sexual harassment such that her complaint to Ms. D'Orazio would have put Ms. D'Orazio on notice that additional training was necessary. *Connick*, 563 U.S. at 62. And again, "the fact that further training might have prevented constitutional injury, does not, in and of itself establish

a failure to train claim." *Kline ex rel. Arndt*, 255 F. App'x at 630. As for custom, Ms. Izzard may have alleged that that "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [her] injury." *Bielevicz*, 915 F.2d at 851. But again, Ms. Izzard's claim fails because she has done nothing more than recite prior complaints against the municipality and has not shown how "those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." *Mariani*, 624 F. Supp. at 511. In other words, she has not alleged "a given course of conduct. . . [that] is so well-settled and permanent as virtually to constitute law" as is required. *Estate of Roman*, 914 F.3d at 798 (internal quotation omitted).

Therefore, the Court grants the defendants' Motion to Dismiss as to Ms. Izzard's claim against Montgomery County for gender discrimination in violation of the Equal Protection Clause in Count II.

### iii.  *Sexual Orientation Discrimination*

Also in Count II of the complaint, Ms. Izzard alleges sexual orientation discrimination in violation of the Fourteenth Amendment's Equal Protection Clause. The defendants argue again, with anemic analysis, that there was no policy, practice, or custom at the facility that is the cause of the alleged constitutional violation. Doc. No. 6-2, at 8–9. The Court agrees that Ms. Izzard has failed to plausibly allege any policy, practice, or custom that would entitle her to relief.

Ms. Izzard is gay and was entitled to be treated equally to similarly situated straight employees within the correctional facility. While race and gender are protected classes under the Equal Protection Clause, neither the Supreme Court nor the Third Circuit Court of Appeals have explicitly held sexual orientation to be a "suspect" or "quasi-suspect" class deserving heightened scrutiny. Nevertheless, considering the decisions in *Romer v. Evans*, 517 U.S. 620 (1996), *United*

*States v. Windsor*, 570 U.S. 744 (2013), and *Obergefell v. Hodges*, 576 U.S. 644 (2015), that analyzed sexual orientation discrimination under the standards regarding impermissible animus or rational basis review, and the Supreme Court's most recent decision in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), it is appropriate for this court to assume that a claim for sexual orientation discrimination sounds in the Equal Protection Clause. *See also Whitewood v. Wolf*, 992 F. Supp. 2d 410, 426 (M.D. Pa. 2014) (analyzing and concluding that sexual orientation is a quasi-suspect class deserving of heightened scrutiny).

At step one of the *Monell* analysis, Ms. Izzard alleges that her supervisors refused to transfer her to another shift but did transfer a straight female employee, that she was subject to discrimination for her sexual orientation, that she was subjected to stricter discipline for her meeting with an inmate than straight employees, that other straight employees concocted a story about her to generate cause for her termination, and that Ms. D'Orazio and Mr. Algarin failed to intervene. *See, e.g.*, Doc. No. 1, Compl. ¶¶ 39, 60–63, 73–74. Ms. Izzard has, therefore, pled that similarly situated individuals were treated differently on the basis of their sexual orientation. This satisfies step one of *Monell* liability by alleging that her constitutionally protected right to equal treatment was violated. *Monell*, 436 U.S. at 694–95. At step two, however, Ms. Izzard's allegations fail.

Ms. Izzard claims that she was not transferred to a better shift but that a straight coworker was transferred. Doc. No. 1, Compl. ¶¶ 38–39. But Ms. Izzard does not allege any official policy or edict of not transferring gay employees. *See Estate of Roman*, 914 F.3d at 798. And again, on a failure to train theory, Ms. Izzard has not alleged that a failure to train *caused* this alleged differential treatment. *Doe*, 660 F.3d at 180. On a custom theory, Ms. Izzard again fails to allege "a given course of conduct. . . [that] is so well-settled and permanent as virtually to constitute law."

*Estate of Roman*, 914 F.3d at 798. Rather, Ms. Izzard only alleges a single isolated incident. Doc. No. 1, Compl. ¶¶ 38–39.

Second, Ms. Izzard claims that her receipt of stricter discipline in January 2019 for meeting with a female inmate was, at least in part, due to her sexual orientation and that it was common practice *not* to discipline straight employees for similar infractions. *Id.* ¶¶ 60–62. But here again, Ms. Izzard has offered no allegation that there is a policy, practice, or custom of disciplining gay employees and not straight employees. *See Estate of Roman*, 914 F.3d at 798. All she has alleged is that other officers were *not* disciplined and that her discipline was "at least in part, because of her race and her sexual orientation." Doc. No. 1, Compl. ¶ 60. But this conclusory allegation does not set out any plausible basis for finding a policy, practice, or custom with which to evaluate a *Monell* claim. *Morse*, 132 F.3d at 906.

Third, Ms. Izzard alleged that one of her direct supervisors did not like gay people and asked another gay coworker, "Why were you gay?" and, "Did something happen to you while you were young?" *Id.* ¶¶ 72–74. While certainly problematic, this account does not allege (or reflect) any policy, practice, or custom as is required under *Monell*. *See Estate of Roman*, 914 F.3d at 798. Further, unlike her claims for race and gender discrimination, it is not clear from her complaint whether Ms. Izzard ever alerted either Ms. D'Orazio or Mr. Algarin to these claims of sexual orientation discrimination. Thus, on a failure to educate or train theory, her claim fails at step one. *See Doe*, 660 F.3d at 179–80. This lack of knowledge is similarly fatal to her claim for a custom because it is not clear whether "policymakers were aware of similar unlawful conduct in the past" such that they "failed to take precautions against future violations, and that this failure, at least in part, led to their injury." *Bielevicz*, 915 F.2d at 851.

Fourth, as to her allegation that other employees concocted a story about her having a relationship and a "wedding" with a female inmate, Doc. No. 1, Compl. ¶¶ 65–67, the same analysis applies. There is no allegation of a policy or edict at the facility; there is neither an allegation of a failure to train employees nor suggestion that a failure to train caused this alleged deprivation; and there is no allegation that this alleged practice was so widespread as to constitute a custom.

Therefore, the Court must grant the Motion to Dismiss as to Ms. Izzard's claim against Montgomery County for sexual orientation discrimination in violation of the Equal Protection Clause in Count II.

### C. The Defendants Have Not Met Their Burden to Dismiss Ms. Izzard's Claims Against Ms. D'Orazio and Mr. Algarin in Their Individual Capacities

The defendants provided one sentence of analysis each for why the Court should grant their Motion to Dismiss Counts I and II for discrimination on the basis of race, gender, or sexual orientation under a theory of individual liability. *See* Doc. No. 6-2, at 8. At the motion to dismiss stage, it is the defense's burden to show that "no claim has been presented" and that dismissal is, therefore, warranted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented"). The Court cannot marshal the arguments for them.

Therefore, the Court denies the defendants' Motion to Dismiss as to the claims against Ms. D'Orazio and Mr. Algarin in their *individual* capacities for race, gender, and sexual orientation discrimination in violation of the Equal Protection Clause in Counts I and II.

**IV.    The Defendants Have Not Met Their Burden to Dismiss Count III or IV**

In Count III of her complaint, Ms. Izzard alleges the creation of a hostile work environment (1) on the basis of gender and (2) on the basis of sexual orientation, both in violation of the Equal Protection Clause. In Count IV of her complaint, Ms. Izzard alleges that her termination in February 2019 was in violation of the Due Process Clause.

Without any legal analysis, the defendants ask the Court to dismiss this Count. *See* Doc. No. 6, at 2. Again, at the motion to dismiss stage, it is the defendants' burden to show that "no claim has been presented" and that dismissal is, therefore warranted. *Hedges*, 404 F.3d at 750. This alone is reason to reject the defendants' request. Moreover, at oral argument counsel for the defendants acknowledged that Counts III and IV would be better addressed at the summary judgment stage.

Therefore, the Court denies the defendants' Motion to Dismiss as to the claims against *both* Montgomery County and Ms. D'Orazio and Mr. Algarin in their *individual* capacities in Counts III and IV.

CONCLUSION

For the foregoing reasons, the Court grants the defendants' Motion to Dismiss all claims against Ms. D'Orazio and Mr. Algarin in their *official* capacities in Counts I–IV, grants the defendants' Motion to Dismiss the claims against Montgomery County in Counts I and II, denies the defendants' Motion to Dismiss the claims against Ms. D'Orazio and Mr. Algarin in their *individual* capacities in Counts I and II, and denies the defendants' Motion to Dismiss the claims against *both* Montgomery County and Ms. D'Orazio and Mr. Algarin in their *individual* capacities in Counts III and IV. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE